**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**LORI LaROCK, as**
**Administratrix of the Estate of**
**ROGER A. SANFORD,**

                                                             **1:19-cv-604**
                **Plaintiff,**                    **(GLS/DJS)**

                  **v.**

**ALBANY COUNTY NURSING**
**HOME et al.,**

                **Defendants.**
_____

| **APPEARANCES:** | **OF COUNSEL:** |
|---|---|
| **FOR THE PLAINTIFF:**<br>Emery Celli Brinckerhoff & Abady LLP<br>600 Fifth Avenue, 10th Floor<br>New York, NY 10020 | DAVID BERMAN, ESQ.<br>ILANN MARGALIT MAAZEL,<br>ESQ. |
| **FOR THE DEFENDANTS:**<br>Burke, Scolamiero & Hurd, LLP<br>7 Washington Square<br>P.O. Box 15085<br>Albany, NY 12212-5085 | STEVEN V. DEBRACCIO, ESQ. |

**Gary L. Sharpe**
**Senior District Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

    Plaintiff Lori LaRock, as administratrix of the estate of Roger A.

Sanford, commenced this action against defendants Albany County Nursing Home, the County of Albany, Larry Slatky, Debbie Gossman, Rhonda Lyga, and John and Jane Does #1-5, alleging a substantive due process claim pursuant to 42 U.S.C. § 1983; a violation of the Federal Nursing Home Reform Amendments (FNHRA)[1] and the Omnibus Budget Reconciliation Act (OBRA)[2]; and separate state law causes of action. (Am. Compl., Dkt. No. 12.) Pending is defendants' motion to dismiss for failure to state a claim. (Dkt. No. 14.) For the reasons that follow, the motion is denied.

## II. **Background**

### A. **Facts**[3]

Sanford, a seventy-three-year-old who suffered from Alzheimer's disease and multiple forms of heart disease, passed away in March 2018. (Am. Compl. ¶¶ 4, 26.) Prior to his passing, Sanford's family placed him into the Albany County Nursing Home because he needed assistance in performing basic tasks, including dressing and feeding himself, and taking

---

[1] *See* 42 U.S.C. § 1396r.

[2] *See* 42 C.F.R. §§ 483.1-483.480.

[3] The facts are presented in the light most favorable to LaRock.

his daily medications, all of which he was no longer able to do alone. (*Id.* ¶¶ 25-27.)

From the outset, Sanford's daughter, LaRock, would often find her father "unchanged, unfed, unmedicated, unwashed, unshaven, and even covered in his own urine and feces." (*Id.* ¶ 5.) In one instance, LaRock "found her father covered in his own urine only to be told that the nursing home was 'short staffed' and that she would have to change him; otherwise, he would not be changed in the near future." (*Id.* ¶ 30.) On another occasion, LaRock found her father "only partially dressed—laying in bed with his shirt half on and hanging over the back of his neck with his chest and stomach exposed." (*Id.* ¶ 31.) LaRock also alleges that the nursing home "refused to feed" Sanford, and LaRock would often find him "sitting in bed with his dinner tray in front of him, unable to eat because no staff would assist him." (*Id.* ¶ 32.)

LaRock further claims that the nursing home staff refused to treat Sanford's medical conditions, and would often leave prior to completion of his chronic obstructive pulmonary disease treatment. (*Id.* ¶¶ 34-35.)

After complaining to a social worker about the nursing home's treatment of Sanford, a staff member "confronted [LaRock] and sniped:

'you don't have to tell on us.'" (*Id.* ¶ 41.) LaRock then went to Slatky with her concerns regarding her father's care, but Slakty "threatened [LaRock] that any paperwork would be 'lost' if [she] complained about the Nursing Home to [the Department of Health (DOH)]," and "boasted that a relative of a Nursing Home employee worked in the DOH department that receives complaints, and no complaint against the Nursing Home would see the light of day." (*Id.* ¶¶ 43-44, 49-50.)

On February 24, 2018, about a week prior to Sanford's passing, LaRock noticed a change in her father: he seemed lethargic; was coughing more than usual; and his breathing sounded raspy. (*Id.* ¶ 57.) LaRock also noticed that he had "vomited in his bed," which had not been cleaned up. (*Id.*) She then went to speak to Gossman, the head of nursing, and asked for her father to be sent to the hospital for further evaluation. (*Id.* ¶¶ 58-59.) Gossman refused, stating that the necessary testing could be done at the nursing home with its chest x-ray machine. (*Id.* ¶ 61.) However, no chest x-ray was ever performed on Sanford between February 24, 2018 and the day of his passing, one week later. (*Id.* ¶ 62.)

Two days later, LaRock called Slatky to inform him of her father's condition, and sent him a picture of Sanford "covered in his own vomit."

(*Id.* ¶¶ 63-64, 66.)  Slatky told LaRock that the picture "can't prove anything."  (*Id.* ¶ 68.)  Slatky did not take any further action, and failed to speak with any nursing home staff regarding Sanford's care or medical attention.  (*Id.* ¶¶ 76-77, 80.)

On March 1, 2018, LaRock, after receiving a voicemail message from Gossman regarding Sanford's condition, went to the nursing home, where she found her father "laying unattended in his room in agony," "drenched in sweat," "violently gasping for air," with "[a]n oxygen tube [hanging] from [his] nose."  (*Id.* ¶¶ 83-84, 87, 89, 91-93.)  LaRock "screamed for help," but "[n]o one responded."  (*Id.* ¶¶ 95-96.)  She then found Lyga, a nurse, who "did not deny that . . . Sanford was in urgent need of medical care," but stated that "[she] did not leave him there, . . . Gossman did," and made no effort to help Sanford or get him medical attention.  (*Id.* ¶¶ 98-103.)

Other additional staff at the nursing home "knew about . . . Sanford's grave medical condition, yet abandoned [him] as he lay dying in his room."  (*Id.* ¶ 106.)  Further, when Gossman became aware of the situation, she "reacted with no urgency," did not offer any medical assistance, and left him "unattended by any medical personnel."  (*Id.* ¶¶ 111-14.)

LaRock called 911, (*id.* ¶ 110), and, according to "[c]ontemporaneous

5

records from emergency paramedics," Sanford was "found laying in [the] hospital bed unresponsive in obvious respiratory failure near respiratory arrest, was pale and sweating excessively, and was in need of immediate airway support," (*id.* ¶ 115 (internal quotation marks omitted).).

Sanford was transferred to Albany Medical Center, where doctors assessed that he "likely aspirated on his own vomit," and "medical care was too late." (*Id.* ¶¶ 118-19.) Sanford passed away on March 3, 2018 of aspiration pneumonia. (*Id.* ¶¶ 121-22.)

Following her father's death, LaRock filed a complaint with the DOH. (*Id.* ¶ 123.) After conducting an investigation, reviewing medical records, and interviewing various nursing home staff, the DOH concluded that the nursing home: "violated 42 C.F.R. § 483.24 by failing to provide . . . Sanford with basic life support, including CPR, to a resident requiring such emergency care prior to the arrival of emergency medical personnel and subject to related physician orders and the resident's advance directives"; "violated 42 C.F.R. § 483.25 by failing to ensure that residents receive treatment and care in accordance with professional standards of practice, the comprehensive person-centered care plan, and the resident's choices"; and

> violated 42 C.F.R. § 483.25(i) by failing to provide respiratory care and failing to ensure that a resident who needs respiratory care, including tracheostomy care and tracheal suctioning, is provided such care, consistent with professional standards of practice, the comprehensive person-centered care plan, the residents' goals and preferences.

(*Id.* ¶¶ 123-31, 134, 137 (internal quotation marks and citation omitted).)

During the investigation, DOH found that defendants failed to document how much oxygen they were providing to Sanford; failed to provide an ongoing assessment of his respiratory status; and failed to follow procedures in case of a medical emergency. (*Id.* ¶¶ 140-54.) Slatky admitted that, had proper protocol been followed, Sanford would have been treated sooner. (*Id.* ¶ 156.) And, had Gossman and Lyga informed the staff of Sanford's condition, allowing for proper protocol to be followed, Sanford "would likely have lived." (*Id.* ¶ 160.)

## B.  Procedural History

LaRock commenced this action by filing a complaint on May 21, 2019. (Compl., Dkt. No. 1.) Defendants thereafter moved to dismiss. (Dkt. No. 10.) In response, LaRock filed an amended complaint as of right, which is now the operative pleading. (Am. Compl.) In her amended complaint, LaRock alleges the following causes of action: (1) a denial of

substantive due process rights pursuant to 42 U.S.C. § 1983; (2) a violation of rights under the FNHRA and the OBRA regulations; (3) a violation of New York Public Health Law § 2801-d; (4) negligence; and (5) medical malpractice. (*Id.* ¶¶ 178-263.)

### III. Standard of Review

The standard of review under Fed. R. Civ. P. 12(b)(6) is well settled and will not be repeated here. For a full discussion of the governing standard, the court refers the parties to its prior decision in *Ellis v. Cohen & Slamowitz, LLP*, 701 F. Supp. 2d 215, 218 (N.D.N.Y. 2010).

### IV. Discussion

#### A. Substantive Due Process

In her amended complaint, LaRock advances three theories to support her substantive due process claim, alleging that defendants "shocked the conscience, violated any norm of professional judgment, and were deliberately indifferent to . . . Sanford's health and safety and to a known risk of serious and immediate risk of harm to him." (Am. Compl. ¶ 226.) However, in her response, LaRock narrows what she plead to only two theories: deliberate indifference and state-created danger. (Dkt. No. 18 at 8.) Defendants argue generally that LaRock fails to state a

substantive due process claim. (Dkt. No. 14, Attach. 2 at 3-14.) More specifically, defendants maintain that the deliberate indifference test does not apply; that the core of LaRock's allegations concern governmental inaction; and what little affirmative conduct is alleged does not shock the conscience. (*Id.*) In response, LaRock contends that Sanford had a substantive due process right "to be free from the county's deliberately indifferent care," that the risk to his health was "obvious," but defendants failed to provide medical help, and instead "increased the threat of harm to . . . Sanford," left him "more vulnerable," and prevented him from receiving proper treatment. (Dkt. No. 18 at 8-14.) For the reasons that follow, defendants' motion to dismiss LaRock's substantive due process claim is denied.

The Fourteenth Amendment Due Process Clause provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. In addition to the guarantee of a fair process, the Due Process Clause also "cover[s] a substantive sphere as well, 'barring certain government actions regardless of the fairness of the procedures used to implement them.'" *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (quoting *Daniels v.*

*Williams*, 474 U.S. 327, 331 (1986)). "The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989).

"[I]n a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Lewis*, 523 U.S. at 847 n.8. The Supreme "Court has said that the 'shock the conscience' standard is satisfied where the conduct was 'intended to injure in some way unjustifiable by any government interest,' or in some circumstances if it resulted from deliberate indifference." *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1906 (2018) (quoting *Lewis*, 523 U.S. at 849-50). "It is well-settled that [government officials'] conduct arising from deliberate indifference can shock the conscience when [government officials] 'hav[e] time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations.'" *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 437 n.14 (2d Cir. 2009) (quoting *Lewis*, 523 U.S. at 853).

10

The language of the Due Process Clause "forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *DeShaney*, 489 U.S. at 195. "[I]n certain limited circumstances[, however,] the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." *Id.* at 198. "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* at 199-200. An individual is in governmental custody when he is incarcerated or involuntarily committed to a state facility. *See, e.g.*, *Estelle v. Gamble*, 429 U.S. 97 (1976) (recognizing the government's obligation to provide medical care to incarcerated prisoners); *Youngberg v. Romeo*, 457 U.S. 307 (1982) (recognizing the government's obligation "to provide involuntarily committed mental patients with such services as are necessary to ensure their 'reasonable safety' from themselves and others," *DeShaney*, 489 U.S. at 199 (quoting *Youngberg*, 457 U.S. at 324)). "The [*DeShaney*] Court stressed that the involuntary

nature of the commitment was determinative," *Brooks v. Giuliani*, 84 F.3d 1454, 1466 (2d Cir. 1996); *but see Soc'y for Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239, 1245 (2d Cir. 1984) (stating, in a case that pre-dated *DeShaney*, that the voluntariness distinction is irrelevant), in these so-called "special relationship" cases, *Pena v. DePrisco*, 432 F.3d 98, 109 (2d Cir. 2005).

An affirmative duty to protect may also arise when the state itself creates or increases the danger. *See Pena*, 432 F.3d at 108. The "distinction between these [two] categories of [affirmative duty] cases suggests that 'special relationship' liability arises from the relationship between the state and a particular victim, whereas 'state created danger' liability arises from the relationship between the state and *[a] private assailant*." *Id.* at 109 (emphasis added). The state-created danger theory turns on whether the governmental conduct is passive or affirmative, the latter of which will support such a claim. *Id.* at 109-10.

With these principles in mind, the court turns to LaRock's two theories of liability: deliberate indifference and affirmative duty by virtue of

12

a state-created danger.[4]  (Dkt. No. 18 at 8.)

1. *Deliberate Indifference*

At this juncture, LaRock has stated a claim under the deliberate indifference theory, because she has sufficiently alleged that defendants are state actors, who knew or should have known of a serious and immediate risk of harm to Sanford, and failed to take action. *See Lewis*, 523 U.S. at 847 n.8; (Am. Compl. ¶¶ 224-26.)  According to LaRock, the risk to Sanford's health was "obvious," but the nursing home repeatedly left him unfed, unchanged, unmedicated, covered in his own feces, and generally unattended. (*Id*. ¶¶ 28-37.)  When this was brought to Slatky's attention, he "threatened that any paperwork would be 'lost' if [] LaRock complained about the Nursing Home to DOH." (*Id.* ¶ 49.)  Similar complaints had allegedly been brought to the nursing home's attention, but defendants "typically rebuffed and ignored their complaints."  (*Id.* at ¶¶

---

[4] As defendants argue, (Dkt. No. 26, Attach. 1 at 3-4), it is not apparent from the amended complaint that LaRock was advancing a state-created danger theory.  Assuming without deciding that she alleged such a theory, it fails for the reasons explained herein.  Additionally, the parties argue at length about the voluntariness of Sanford's residence at the Albany County Nursing Home, (Dkt. No. 18 at 8-10; Dkt. No. 26, Attach. 1 at 1-3), but this would only be relevant under the unpursued theory of special relationship giving rise to an affirmative duty.  As such, the court does not address it here.

13

181-221.)

Further, on the day of Sanford's death, he was "in obvious respiratory failure," but defendants failed to provide medical help. (*Id*. ¶¶ 113-15.) As uncovered by the DOH's investigation, and admitted by Slakty, the nursing home failed in several aspects of its treatment of Sanford, and, had proper protocol been followed, he would have been treated sooner.
(*Id.* ¶¶ 123-68.)

LaRock's allegations sufficiently support that defendants, who were responsible for Sanford's well-being and medical care, acted with deliberate indifference to the serious and immediate risk of harm to Sanford that shocks the conscience, and would provide a reasonable jury with a valid basis to so find, subject to further arguments and discovery by the parties. Accordingly, LaRock's claim under the deliberate indifference theory survives defendants' motion to dismiss.

    2.  *State-Created Danger*

To the extent LaRock's amended complaint can be read as alleging an affirmative duty under the state-created danger doctrine, such theory of liability does not apply here. This is so because the harm suffered is not alleged to be the result of some private assailant's conduct, which was

14

encouraged or otherwise countenanced by the state. Rather, LaRock argues that the behavior of individual defendants, all of whom are government officials, constituted the requisite affirmative acts. (Dkt. No. 18 at 15.) In advancing her argument that the state-created danger theory does not require a violent act by a private third party, LaRock attempts to rely on *Pena* and *Lombardi*. (*Id.*) However, in *Pena*, the violence was by an off-duty police officer who was "acting in his *personal* capacity and was therefore not a state actor." 432 F.3d at 107 (emphasis added). LaRock's reliance on *Lombardi* fares no better. There, in dicta, the Second Circuit posited that the state-created danger theory arguably lay where environmental conditions caused harm because "the defendants, with knowledge of the serious health risks posed by these conditions, falsely represented to the public that it was safe from any such risks." *Lombardi v. Whitman*, 485 F.3d 73, 80 (2d Cir. 2007). However, *Lombardi* was disposed of on other grounds. *Id.* at 81 ("[W]e decide the case on the ground that the conduct alleged, even assuming causation, does not shock the conscience."). Accordingly, LaRock's claim under the state-created danger theory fails.

  For the foregoing reasons, defendants' motion to dismiss LaRock's

15

substantive due process claim is denied, insofar as LaRock alleges a claim under the deliberate indifference theory.

**B.** *__Monell__* **Claim**

As for the nursing home and Albany County, defendants assert that LaRock has failed to state a *Monell* claim because LaRock fails to mention policymakers or training, fails to provide a "plausible, non-conclusory allegation that a formal policy was officially endorsed by the municipality," and "fails to plead a constitutional violation at all." (Dkt. No. 14, Attach. 2 at 19-21.)

A municipality may be liable under § 1983 if a municipal "policy or custom" causes "deprivation of rights protected by the Constitution." *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690-91 (1978). "A policy or custom may be established by any of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom through which constructive notice is imposed upon policymakers; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised 'deliberate indifference' to the rights of the

16

plaintiff." *Thomas v. City of Troy*, 293 F. Supp. 3d 282, 298 (N.D.N.Y. 2018) (citations omitted).

Here, LaRock has alleged sufficient factual detail that defendants violated Sanford's constitutional rights resulting from defendants' "pattern and practice of mistreatment, and . . . policy of understaffing." (Am. Compl. ¶¶ 178-222.) For example, LaRock contends that the nursing home left residents to sit in their own bodily fluids; failed to provide them with proper end-of-life care and follow proper protocol; did not properly feed them or administer medication; and left them in high-risk positions. (Am. Compl. ¶¶ 5, 32, 34-35, 111-14, 123-31, 134, 137, 140-54.) A reasonable jury could find a sufficient basis for *Monell* liability in the nursing home's lack of response to the complaints made by residents' families. Accordingly, defendants' motion to dismiss LaRock's *Monell* claim is denied.

## C. <u>42 U.S.C. § 1983 and the FNHRA</u>

Defendants argue that LaRock fails to state a cause of action under 42 U.S.C. § 1983 based on a violation of the FNHRA or the OBRA regulations because 42 U.S.C. § 1396r does not give rise to a private right of action. (Dkt. No. 14, Attach. 2 at 14-18.) Defendants primarily rely on

*Baum v. Northern Dutchess Hospital*, which held that the FNHRA does not give rise to a private right of action under § 1983. *See* 764 F. Supp. 2d 410, 428 (N.D.N.Y. 2011). In contrast, LaRock argues that the FNHRA creates an enforceable right under § 1983, and primarily relies on *Pantalone v. County of Fulton*, which held that a plaintiff does have individual rights conferred by the FNHRA, enforceable through § 1983. *See* No. 6:10-CV-913, 2011 WL 1457935, at *8 (N.D.N.Y. Apr. 15, 2011).

At this juncture, recognizing this split, the court need not resolve whether FNHRA provides a private right of action, and will revisit the issue at a later time, subject to further argument, in particular, on the substantive due process claim. Accordingly, defendants' motion to dismiss LaRock's cause of action under 42 U.S.C. § 1983 based on a violation of the FNHRA or OBRA regulations is denied.

### D. State Law Claims

Given the survival of LaRock's federal claims, defendants' argument that the court should decline to exercise supplemental jurisdiction over LaRock's state law claims for negligence, medical malpractice, and a violation of New York Public Health Law § 2801-d, (Dkt. No. 14, Attach. 2 at 21-23), is rejected. Accordingly, defendants' motion to dismiss

LaRock's state law claims is denied.

## V. Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that defendants' motion to dismiss (Dkt. No. 14) is **DENIED**; and it is further

**ORDERED** that defendants shall respond to the Amended Complaint within the time allotted by the rules; and it is further

**ORDERED** that the parties shall contact Magistrate Judge Daniel J. Stewart to schedule further proceedings; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

March 31, 2020
Albany, New York

Gary L. Sharpe
U.S. District Judge