UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

**LORI LaROCK, as Administratrix of
the Estate of ROGER A. SANFORD,**

                      **Plaintiff,**

              v.                          1:19-cv-604 (AMN/DJS)

**ALBANY COUNTY NURSING HOME,
COUNTY OF ALBANY, LARRY SLATKY,
DEBBIE GOSSMAN, RHONDA LYGA,
and JOHN AND JANE DOES #1-5,**

                      **Defendants.**

---

| APPEARANCES: | OF COUNSEL: |
|---|---|
| **EMERY CELLI BRINCKERHOFF,<br>ABADY, WARD & MAAZEL LLP**<br>600 Fifth Avenue, 10th Floor<br>New York, NY 10020<br>Attorneys for Plaintiff | **ILANN MARGALIT MAAZEL, ESQ.** |
| **BURKE, SCOLAMIERO & HURD, LLP**<br>7 Washington Square<br>P.O. Box 15085<br>Albany, NY 12212-5085<br>Attorneys for named Defendants | **JESSICA LYNNE DARROW, ESQ.**<br>**KEVIN P. BURKE, ESQ.** |

**Hon. Anne M. Nardacci, United States District Judge:**

<strong><u>MEMORANDUM-DECISION AND ORDER</u></strong>

**I.    INTRODUCTION**

      Plaintiff Lori LaRock ("Plaintiff"), as administratrix of the estate of Roger A. Sanford ("Sanford"), commenced this action against defendants Albany County Nursing Home ("ACNH"), County of Albany, Larry Slatky ("Slatky"), Debbie Gossman ("Gossman"), Rhonda Lyga ("Lyga"), and John and Jane Does #1-5 (collectively, "Defendants"), alleging substantive due

process claims pursuant to 42 U.S.C. § 1983 ("Section 1983"), the Federal Nursing Home Reform Act, 42 U.S.C. § 1396r ("FNHRA"), the New York State Public Health Law, N.Y. Pub. Health Law § 2801-d ("NYPHL"), and common law medical malpractice and negligence. Dkt. No. 12. Currently pending before the Court is Defendants' motion for summary judgment on all claims, Dkt. No. 103 (the "Motion"). For the reasons that follow, Defendants' Motion is granted in part and denied in part.[1]

## II.   BACKGROUND

### A.   Facts[2]

#### 1.   Sanford's Daily Care at ACNH

Sanford, Plaintiff's father, moved to ACNH in 2017. Dkt. No. 103-64 at ¶¶ 1, 20. Sanford suffered from dementia, chronic obstructive pulmonary disease, incontinence, and ulcers, and had undergone a left below-the-knee amputation. *Id.* at ¶¶ 8, 71. As a result, Sanford could not get out of bed on his own and required assistance eating, bathing, and changing his clothes. *Id.* at ¶¶ 55, 72-73. Sanford also required daily nebulizer treatments and monitoring for choking and lung congestion. *Id.* at ¶¶ 74-75.

Plaintiff asserts that she and her family often found Sanford unfed, unbathed, ungroomed, and covered in his own urine and vomit. Pl.'s SMF[3] at ¶¶ 47-51, 55-56. Plaintiff also asserts that ACNH staff[4] failed to ensure that Sanford kept his nebulizer mask on during treatments and

---

[1] Defendants' request for oral argument, Dkt. No. 103 at 1, is denied.

[2] Unless otherwise noted, the facts discussed herein are not in dispute.

[3] Plaintiff's Counter-Statement of Facts ("Pl.'s SMF") begins on page 45 of Docket Number 113.

[4] During Sanford's time at ACNH, Lyga was employed by ACNH as a nurse, Gossman was employed by ACNH as a nurse supervisor, and Slatky served as ACNH's administrator. Dkt. No. 103-64 at ¶¶ 31-33, 78, 91.

2

frequently left his room during treatments rather than staying to ensure that he received the necessary dosage. *Id.* at ¶ 53. According to Plaintiff, she made several complaints about these issues to ACNH staff and Slatky, but her complaints were not addressed and Sanford's quality of care did not improve. *Id.* at ¶¶ 57-79.

On the other hand, Defendants claim that Sanford was resistant to being changed, would yell at ACNH staff, and "try to grab the aides or say something about their breasts." Dkt. No. 103-64 at ¶¶ 21, 58, 62. Defendants also claim that Plaintiff never filed a formal report about Sanford's care and did not keep a record or any notes regarding aspects of Sanford's care that concerned her. *Id.* at ¶¶ 66-67.

### 2.  Events of March 1, 2018

On March 1, 2018, Lyga and Gossman found Sanford wheezing and shaking in bed. *Id.* at ¶¶ 121-34, 141. Sanford's temperature rose to 103.4° Fahrenheit. *Id.* at ¶ 142. Gossman called Dr. Ilie Dragomir, an on-call physician for ACNH, to speak about Sanford's condition. *Id.* at ¶ 146;  at ¶¶ 103, 140.

Dr. Dragomir ordered Gossman to give Sanford an antibiotic, Levaquin. Dkt. No. 103-64 at ¶ 147. Plaintiff contends that Gossman reported incorrect vital signs to Dr. Dragomir, making Sanford's condition seem less serious than it was. Pl.'s SMF at ¶¶ 142-43. Plaintiff maintains that Dr. Dragomir also instructed Gossman to send Sanford to the hospital. *Id.* at ¶¶ 144-46. Gossman did not send Sanford to the hospital, but ordered and picked up the Levaquin and gave it to Lyga to administer to Sanford. Dkt. No. 103-64 at ¶¶ 149-150. According to Plaintiff, Gossman told Lyga that giving Sanford the Levaquin was "urgent," yet Lyga waited over ten minutes to administer it. Pl.'s SMF at ¶¶ 151, 161. After administering the Levaquin, Plaintiff claims that Lyga left to serve dinner to other residents, leaving Sanford alone in his room for approximately

3

ten minutes. *Id.* at ¶¶ 166-67.

Sanford's breathing became more labored and Gossman attempted to call Plaintiff about her father, leaving her a voice message at about 6:10-6:15 P.M. Dkt. No. 103-64 at ¶¶ 161-63. According to Plaintiff, when she arrived at ACNH, she found Sanford alone, "laying in bed gasping for air" with "his hair soaking wet with sweat" and "breathing as heavy as he can." Pl.'s SMF at ¶ 187. Plaintiff called 911; she claims she did so at 6:34 P.M. because "nobody [at ACNH] was helping [her] dad." *Id.* at ¶¶ 189-90.

Responding paramedics administered intravenous Ketamine and intubated Sanford. Dkt. No. 103-64 at ¶ 178. Sanford was taken to Albany Medical Center, where his condition deteriorated further, and he was taken off life support and passed away on March 3, 2018.[5] *Id.* at ¶¶ 190, 193.

**B. Procedural History**

Plaintiff filed an amended complaint in July 2019, alleging the following claims: (1) substantive due process claims pursuant to Section 1983 against all Defendants; (2) FNHRA claims pursuant to Section 1983 against all Defendants; (3) NYPHL claims against all Defendants; (4) medical malpractice claims against ACNH, County of Albany, Gossman, Lyga, and John and Jane Does #1-5; and (5) negligence claims against all Defendants. Dkt. No. 12 at 26-33.[6] After

---

[5] On March 2, 2018, ACNH issued Gossman a notice of personnel action regarding her care of Sanford the previous day, which noted that she had "fail[ed] to provide competent, appropriate nursing care to ensure [Sanford's] medical needs [we]re met . . . ." Pl.'s SMF at ¶¶ 226-29. Following Sanford's death, the New York State Department of Health ("DOH") opened an investigation into his treatment on March 1, 2018, which concluded that ACNH had violated three federal regulations and two state regulations in the course of treating Sanford on March 1, 2018. *Id.* at ¶¶ 247-73. ACNH appealed the investigation's findings to the DOH, which appeal the DOH rejected, after which ACNH ceased challenging the findings. *Id.* at ¶¶ 275-780.

[6] Citations to docket entries, including deposition transcripts, utilize the pagination generated by CM/ECF, the Court's electronic filing system.

the Court denied Defendants' motion to dismiss, Dkt. No. 27, Defendants answered Plaintiff's amended complaint. Dkt. No. 29. Defendants now move for summary judgment on all claims.[7]

## III. STANDARD OF REVIEW

Summary judgment is properly granted only if, upon reviewing the evidence in the light most favorable to the nonmovant, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir. 1993). A court first determines "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986). "When analyzing a summary judgment motion, the court 'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Galeotti v. Cianbro Corp.*, No. 5:12-cv-00900 (MAD/TWD), 2013 WL 3207312, at *4 (N.D.N.Y. June 24, 2013) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36-37 (2d Cir. 1994)).

Defendants, in seeking summary judgment, "bear[ ] the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [their] right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995) (citation omitted). To determine whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec.*

---

[7] Defendants also request summary judgment with respect to Plaintiff's "claim for punitive damages." Dkt. No. 103-65 at 42-43. The Court denies this request because punitive damages are not a "claim" and genuine issues of material fact exist regarding the severity of Defendants' conduct. *See infra* §§ IV.C-D; *Cooper v. City of New Rochelle*, 925 F. Supp. 2d 588, 613 (S.D.N.Y. 2013).

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *accord Gibbs-Alfano v. Burton*, 281 F.3d 12, 18 (2d Cir. 2002). A "material" fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 57 (2d Cir. 1997). The Court should "grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative." *Schwimmer v. Kaladjian*, 988 F. Supp. 631, 638 (S.D.N.Y. 1997) (citing, *inter alia*, *Anderson*, 477 U.S. at 249-50).

## IV. DISCUSSION

### A. Substantive Due Process

Plaintiff argues that the Fourteenth Amendment's Due Process Clause provided Sanford with the right to receive adequate medical care at ACNH, even if Sanford resided there voluntarily. Dkt. No. 114 at 19-21. Plaintiff's position is that once the State[8] chose to provide housing and care to Sanford, Defendants acquired an affirmative constitutional duty to provide Sanford with medical care in a manner that was not deliberately indifferent to his medical needs, and that genuine issues of material fact exist as to whether Defendants violated that duty. *Id.*

Defendants counter that Plaintiff's substantive due process claims must be dismissed because, unless the State involuntarily confines an individual, the Fourteenth Amendment does not impose an affirmative duty to provide adequate medical services. Dkt. No. 103-65 at 15-18. Defendants argue that because the Fourteenth Amendment prohibits deprivations, not inaction, they cannot be constitutionally liable for failing to provide better medical care. *Id.* The Court

---

[8] In the context of Plaintiff's substantive due process claims, "the State" refers to Defendants, as they are state actors. *See, e.g.*, Dkt. No. 114 at 21.

agrees with Defendants.

The Court's earlier order, Dkt. No. 27 at 11-14, presumed that the Fourteenth Amendment imposes an affirmative duty on the states to provide voluntary residents of state nursing homes with adequate medical services. Assuming such a duty existed, the Court concluded that Plaintiff plausibly alleged that Defendants' inaction violated their duty by displaying deliberate indifference to Sanford's medical needs. *Id.* at 13-14. However, upon further examination of the controlling substantive due process jurisprudence, and heeding the Supreme Court's instruction that "[t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field," *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992), the Court finds, for the reasons explained below, that the Due Process Clause does not impose an affirmative duty on the states to provide adequate medical services to individuals voluntarily residing at state-actor nursing homes. Accordingly, the Fourteenth Amendment is not the proper vehicle to challenge Defendants' alleged inaction or deliberate indifference towards Sanford's medical needs and Plaintiff's substantive due process claims must be dismissed.

The right to substantive due process as applied to the states is rooted in the Fourteenth Amendment, which provides that no person shall be deprived "of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV, § 1. Regardless of the fairness of the procedures used, the Clause prohibits executive action that is (1) "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience," *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998), and (2) deprives an individual of a liberty interest that is "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty," *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997).

Importantly, substantive due process provides a right *against government deprivations*, not

a right to government assistance. *See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989) ("The [Due Process] Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security.") In other words, "the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Id.* at 196 (citations omitted). Therefore, subject to the exceptions discussed below, the Due Process Clause imposes no affirmative duty on the states to provide adequate medical services to a person not held in state custody involuntarily, even if doing so is necessary to securing their life, liberty, or property. *See Charles v. Orange Cnty.*, 925 F.3d 73, 81-82 (2d Cir. 2019) (citing *DeShaney*, 489 U.S. at 196, 199-200).

In *DeShaney*, the Supreme Court recognized that "[i]t is true that in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." 489 U.S. at 198. However, the *DeShaney* Court asserted that this duty only arises "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs . . . ." *Id.* at 200. The Court admonished that the affirmative duty to provide adequate medical services "arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which [the State] has imposed on his freedom to act on his own behalf." *Id.*; *accord Estelle v. Gamble*, 429 U.S. 97, 102-07 (1976) (holding that the State has an affirmative duty to provide adequate medical services to incarcerated individuals because the individual is unable, by reason of the State's deprivation of his liberty, to care for himself); *Youngberg v. Romeo*, 457 U.S. 307, 314-25 (1982) (holding that substantive due process imposes an affirmative duty on the State to

8

provide involuntarily committed mental patients with adequate medical services because the State deprived the patients of their liberty and their ability to care for themselves by involuntarily committing them). The Court succinctly summarized the rule: "Taken together, [*Estelle* and *Youngberg*] stand only for the proposition that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney*, 489 U.S. at 199-200. Accordingly, unless the State affirmatively deprives an individual of liberty by restraining him against his will and rendering him unable to care for himself, the State has no Fourteenth Amendment duty to provide adequate medical services. *See Charles*, 925 F.3d at 81-82 (citing *DeShaney*, 489 U.S. at 196-200).

Here, Defendants' inaction—that is, their alleged deliberate indifference to Sanford's medical needs—cannot support a substantive due process claim because Defendants did not involuntarily confine Sanford to ACNH. Sanford was not involuntarily confined because the parties agree that Plaintiff could have brought Sanford to her home to get care, Dkt. No. 103-64 at ¶ 18; Dkt. No. 113 at 4 (Plaintiff denies Defendants' statement of fact only to the extent that she was limited by what she could afford), and that Defendants had no say in whether Sanford was removed from ACNH, Dkt. No. 103-64 at ¶¶ 26-29. Therefore, because the State did not restrain Sanford's liberty by involuntarily confining him, Defendants had no affirmative constitutional duty to provide adequate medical services. *See Matican v. City of New York*, 524 F.3d 151, 156 (2d Cir. 2008) (noting that the duty to provide medical care in a manner that is not deliberately indifferent "arises solely from 'the State's affirmative act of restraining the individual's freedom to act on his own behalf [] through incarceration, institutionalization, or other similar restraint of personal liberty'") (quoting *DeShaney*, 489 U.S. at 200). Sanford's inability to care for himself

did not result from the State's deprivation of his liberty. As a result, Defendants were under no constitutional duty to provide any medical care to Sanford or to refrain from being deliberately indifferent to his medical needs. *See Youngberg*, 457 U.S. at 317 ("a State is under no constitutional duty to provide substantive services to those within its border") (citations omitted); *Harris v. McRae*, 448 U.S. 297, 317-18 (1980) ("Although the liberty protected by the Due Process Clause affords protection against unwarranted government interference . . . it does not confer an entitlement to such [government aid] as may be necessary to realize all the advantages of that freedom. To hold otherwise would mark a drastic change in our understanding of the Constitution.").

Plaintiff's reliance on *Society for Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239 (2d. Cir. 1984), for the proposition that the Constitution entitles voluntary residents of state facilities to adequate medical care, *see* Dkt. No. 114 at 13-15, is misplaced. First, *DeShaney* was decided after *Society for Good Will*, and explicitly held that the affirmative duty to provide medical care *only* arises when the State restrains an individual's liberty and renders him unable to care for himself. *See DeShaney*, 489 U.S. at 200 ("In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means."). Second, subsequent Second Circuit authority directly contradicts Plaintiff's use of *Society for Good Will*. *See Brown v. City of New York*, 786 F. App'x 289, 293 (2d Cir. 2019) (recognizing that *DeShaney* was decided after and clarifies *Society for Good Will*, and reiterating that since *DeShaney* the Second Circuit has "focused on involuntary custody" to determine whether a constitutional duty to provide

adequate care exists) (quoting *Matican*, 524 F.3d at 156; and citing *Suffolk Parents of Handicapped Adult v. Wingate*, 101 F.3d 818, 823 (2d Cir. 1996) (holding that the Due Process Clause confers no affirmative right to governmental aid and recognizing only one exception: "when the State takes a person into its custody and *holds him there against his will*") (quotation omitted); *Brooks v. Giuliani*, 84 F.3d 1454, 1466 (2d Cir. 1996) (holding that "involuntary nature of the commitment was determinative" to Supreme Court's analysis of special-relationship exception)).[9]

To be sure, as in *DeShaney*, "knowledge of the individual's predicament [and] expressions of intent to help him," did not create a constitutional duty to provide government services. 489 U.S. at 203 (rejecting substantive due process claim of free citizen because "[t]he most that can be said of the state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them"). Even if state tort law imposed an affirmative duty on Defendants to provide Sanford with adequate care once they began caring for him, substantive due process "does not transform every tort committed by a state actor into a constitutional violation." *Id.* at 202 (collecting cases). "A State may, through its courts and legislatures, impose such affirmative duties of care and protection upon its agents as it wishes. But not all common-law duties owed by government actors were constitutionalized by the Fourteenth Amendment." *Id.* (quotation omitted); *see also Lewis*, 523 U.S. at 847 n.8 ("[E]xecutive action challenges raise a particular need to preserve the constitutional proportions of constitutional

---

[9] Plaintiff acknowledges that the Second Circuit clarified the substantive due process standard post-*DeShaney*, but nevertheless continues to assert that the Court should apply *Society for Good Will* to allow Plaintiff's substantive due process claims to proceed. *See* Dkt. No. 114 at 21 n.4 (citing *Brooks*, 84 F.3d at 1466, but focusing on the State's assumption of responsibility for providing care without acknowledging *Brooks'* holding that the "involuntary nature of the commitment was determinative" to Supreme Court's analysis in *DeShaney*).

claims, lest the Constitution be demoted to . . . a font of tort law."). Therefore, because Defendants were under no affirmative constitutional duty to provide medical care to Sanford, and because Plaintiff's substantive due process claims merely challenge Defendants' deliberate indifference, inaction, and failure to provide better care without alleging that Sanford was involuntarily confined, Dkt. No. 12 at ¶¶ 223-231; Dkt. No. 114 at 22-25, 40, Defendants cannot be liable under the Fourteenth Amendment. *See, e.g.*, *Archie v. Racine*, 847 F.2d 1211, 1220 (7th Cir. 1988) ("[T]he Due Process Clause, in particular, is a charter of negative rather than positive liberties. The men who wrote the Bill of Rights were not concerned that Government might do too little for the people but that it might do too much to them. The Fourteenth Amendment, adopted in 1868, at the height of laissez-faire thinking, sought to protect Americans from oppression by state government, not to secure them basic governmental services.") (internal quotation marks and citation omitted).[10]

Accordingly, Defendants' Motion is granted with respect to Plaintiff's substantive due process claims.

**B.  FNHRA**

The FNHRA sets forth requirements that nursing homes must meet to receive Medicaid funding. *See* 42 U.S.C. § 1396r. These requirements, as further defined by the FNHRA's implementing regulations,[11] include protecting residents' rights to be free from neglect, live in a sanitary environment, and have a resident physician consulted upon a significant change in

---

[10] Plaintiff's arguments for *Monell* liability against County of Albany and ACNH, as they relate to the Substantive Due Process Clause, must be rejected because there cannot be *Monell* liability without an underlying constitutional violation. *See Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006). This rejection moots Plaintiff's letter motion, Dkt. No. 120, in which she requests permission to respond to the *Monell* argument raised by Defendants in their reply brief.

[11] *See* 42 C.F.R. § 483.1 *et seq*.

physical health.  *See id*. at § 1396r(c); 42 C.F.R. §§ 483.12, 483.10(i),(g)(14)(i)(B).

Defendants contend that Plaintiff's FNHRA claims must be dismissed because (1) the FNHRA is not privately enforceable by nursing home residents pursuant to Section 1983, and (2) "any [FNHRA] violations did not proximately cause any harm to Mr. Sanford."  Dkt. No. 103-65 at 33-39.  Both arguments fail.

First, subsequent to Defendants' motion for summary judgment, the Supreme Court held that the FNHRA confers nursing home residents with individual rights that are enforceable by Section 1983.  *See Health & Hosp. Corp. v. Talevski*, 599 U.S. 166, 171-72 (2023).  Though *Talevski* dealt with residents' right to be free from physical or chemical restraints and rights regarding transfer and discharge, it is nevertheless applicable to Defendant's arguments here. Defendants argue generally that Congress did not intend to create individual rights for nursing home residents and that legislation enacted pursuant to Congress' spending power is not enforceable by private parties under Section 1983.  Dkt. No. 103-65 at 33-36; Dkt. No. 119-1 at 13. *Talevski* rejects both of these arguments.  599 U.S. at 175-91.  To the extent that Defendants object to Plaintiff's reliance on 42 C.F.R. §§ 483.1-483.480, *see* Dkt. No. 103-65 at 36-37, Plaintiff's reliance is permissible because the FNHRA creates privately enforceable rights and the implementing regulations determine the scope of those rights.  *See Alexander v. Sandoval*, 532 U.S. 275, 284 (2001) ("[R]egulations, if valid and reasonable, authoritatively construe the statute itself, and it is therefore meaningless to talk about a separate cause of action to enforce the regulations apart from the statute.  A Congress that intends the statute to be enforced through a private cause of action intends the authoritative interpretation of the statute to be so enforced as well.") (citations omitted); *Shakhnes v. Berlin*, 689 F.3d 244, 251 (2d Cir. 2012) ("[S]o long as the statute itself confers a specific right upon the plaintiff, and a valid regulation merely further defines

or fleshes out the content of that right, then the statute—in conjunction with the regulation—may create a federal right as further defined by the regulation.") (quotation and emphasis omitted).

Second, Defendants' argument that, even if they violated the FNHRA, they cannot be liable under Section 1983 because they "did not cause any patient harm," Dkt. No. 103-65 at 37-39, is mistaken. Even when a plaintiff cannot establish that a defendant proximately caused actual harm, Section 1983 still imposes liability for nominal damages. *See Carey v. Piphus*, 435 U.S. 247, 266 (1978) (recognizing that nominal damages are appropriate to vindicate Section 1983 rights because "the law recognizes the importance . . . that those rights be scrupulously observed"); *accord Vincent v. Annucci*, 63 F.4th 145, 151 (2d Cir. 2023).

Therefore, Defendants' Motion is denied with respect to Plaintiff's FNHRA claims.[12]

## C. New York Public Health Law

The NYPHL provides that "[a]ny residential health care facility that deprives any patient of said facility of any right or benefit, as hereinafter defined,[13] shall be liable to said patients for injuries suffered as a result of said deprivation, except as hereinafter provided." N.Y. Pub. Health Law § 2801-d(1). The law also states that every patient "shall have the right to receive adequate

---

[12] Although Defendants argue that County of Albany and ACNH cannot be liable under *Monell* for "substantive due process" or "constitutional rights" violations, Dkt. No. 103-65 at 24-32, Defendants do not address *Monell* liability in the context of Plaintiff's FNHRA claims. *Id.* at 33-39; Dkt. No. 119-1 at 12-14. Accordingly, the Court need not reach the issue. *See* Fed. R. Civ. P. 56(a). In any event, *Monell* liability can attach to State entities where Plaintiff can "provide evidence that a [County of Albany or ACNH] policy, custom, or a failure to implement a policy caused the alleged FNHRA violations." *Beaty v. Delaware Cnty.*, Civ. No. 21-1617, 2023 WL 5423020, at *2 (E.D. Pa. Aug. 10, 2023) (citing *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 585 (3d Cir. 2003); *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690 (1978)). Plaintiff's evidence of, among other things, the DOH findings, *see supra* § II.A.2 n.5, could permit a reasonable jury to find such liability.

[13] A "right or benefit" is defined as "any right or benefit created or established for the well-being of the patient by the terms of any contract, by any state statute, code, rule or regulation or by any applicable federal statute, code, rule or regulation . . . ." N.Y. Pub. Health Law § 2801-d(1).

14

and appropriate medical care" and "shall have the right to receive courteous, fair, and respectful care and treatment." *Id*. at §§ 2803-c(3)(e), (g). Additionally, residents who are unable to carry out the activities of daily living have the right to "necessary services to maintain good nutrition, grooming, and personal and oral hygiene." 10 N.Y.C.R.R. § 415.12(a)(3). The statute provides an affirmative defense where "the facility exercised all care reasonably necessary to prevent and limit the deprivation and injury for which liability is asserted . . . ." N.Y. Pub. Health Law § 2801-d(1).

Defendants argue that they exercised all care reasonably necessary to prevent and limit deprivations of Sanford's rights under NYPHL because Defendants "treated, and addressed [Sanford's] medical needs," and because "[Sanford] was regularly changed and staff assisted him with feedings," as demonstrated by the fact that "he had no bedsores, despite being wheelchair-bound and non-ambulatory for the eight months he stayed at [ACNH]." Dkt. No. 103-65 at 40. However, Plaintiff has introduced evidence from which a reasonable jury could conclude that Sanford was not provided with adequate medical care and hygienic services, and that Defendants did not exercise all care reasonably necessary to prevent this from occurring: ACNH staff testified that Sanford could not get of bed on his own and required significant assistance to perform daily tasks, such as eating, drinking, bathing, using the bathroom, and changing his clothes, Pl.'s SMF ¶¶ 43-45; Plaintiff testified that ACNH staff would fail to feed Sanford, would leave him covered in his own urine, and would fail to shave him, bathe him, or groom him, *id.* at ¶ 47; Plaintiff testified that she would find Sanford soaked in his own bodily fluids and that ACNH staff told her that she would have to change Sanford herself because ACNH was "short staffed," *id.* at ¶ 51; Plaintiff testified that Sanford would take his nebulizer mask off because he did not understand that he was receiving medical treatment and that ACNH staff would frequently start Sanford's

nebulizer treatment and then leave the room, rather than staying to ensure that Sanford received the necessary dosage of medication, *id.* at ¶ 53; Plaintiff's daughter testified that she visited Sanford three times per week and that "he wasn't being fed properly, that he wasn't being cared for properly, always urine down to his knees, his breathing machine would not be on him, [and] nurses wouldn't watch him [while he was using his nebulizer]," *id.* at ¶ 48; Plaintiff's husband testified that he frequently complained to aides that Sanford had been left unchanged, yet he would frequently find Sanford covered in urine when he came to visit and, on one occasion, found Sanford covered in dried vomit, *id.* at ¶¶ 49-50; ACNH staff testified that blank boxes in their record logs indicated that an activity had not happened, and record logs from over forty eight-hour shifts were left blank for Sanford's feeding, personal hygiene checks, and toileting needs, *id.* at ¶¶ 54-56; and finally, Gossman was issued a notice of personnel action for "fail[ing] to provide competent, appropriate nursing care" because she failed to sufficiently address Sanford's low oxygen saturation and high fever on March 1, 2018 and failed to ensure that Sanford was transferred to the emergency room, where his medical needs could be addressed, *id.* at ¶¶ 226-28.

Accordingly, Defendants' Motion is denied with respect to Plaintiff's NYPHL claims.

D.   **Medical Malpractice**

Defendants argue that they are entitled to summary judgment "because it is clear . . . that their care did not lead to Mr. Sanford's death." Dkt. No. 103-65 at 41. Plaintiff contends that Dr. Keith Harris' expert report demonstrates that genuine issues of material fact exist regarding proximate cause. Dkt. No. 114 at 31-32, 38. The Court agrees with Plaintiff.

Under New York medical malpractice law,[14] a defendant is entitled to summary judgment

---

[14] The parties do not dispute that New York's substantive law applies to Plaintiff's medical malpractice and negligence claims. *See* Dkt. No. 103-65 at 41-42; Dkt. No. 114 at 31-32, 38-39.

where undisputed facts show that the defendant "'did not depart from acceptable standards of care or that any such departure did not cause the injury.'" *Valdes v. Brooks*, No. 21-2971-cv, 2023 WL 309611, at *2 (2d Cir. Jan. 19, 2023) (quoting *Gallagher v. Cayuga Med. Ctr.*, 151 A.D.3d 1349, 1351 (3d Dep't 2017)). "A plaintiff can defeat summary judgment by providing an expert opinion that 'demonstrates the requisite nexus between the malpractice allegedly committed and the harm suffered.'" *Id.* (quoting *Park v. Kovachevich*, 116 A.D.3d 182, 191 (1st Dep't 2014)). "'Expert opinions, in order not to be considered speculative or conclusory, should address specific assertions made by the movant's experts, setting forth an explanation of the reasoning and relying on specifically cited evidence in the record.'" *Id.* (quoting *Attia v. Klebanov*, 192 A.D.3d 650, 651 (2d Dep't 2021)).

Here, Plaintiff has provided an expert report from Dr. Harris. Dkt. No. 111-2. Dr. Harris reviewed medical records from ACNH and Albany Medical Center, the EMS call transcript, EMS records from March 1, 2018, and a video recording of Sanford on March 1, 2018. *Id.* at 2. Dr. Harris disagreed with Defendants' expert, Dr. Steven Salzman, and concluded that Code E or 911 should have been called earlier to address Sanford's unstable vital signs and severe hypoxemia, and to ensure that Sanford received appropriate respiratory care. *Id.* at 6-8. Dr. Harris stated that "[h]ad [Sanford] been provided earlier intervention, to a reasonable medical certainty [the progression from respiratory difficulty to respiratory distress and failure] would have been avoided." *Id.* at 7-8. Dr. Harris reasoned that earlier intervention could have afforded Sanford with "therapies such as oxygen, BVM ventilation, IV fluids, and if needed intubation," which "have been repeatedly demonstrated to reduce and many times completely stop the progression from respiratory difficulty to respiratory distress and failure." *Id.* Dr. Harris concluded "to a reasonable medical certainty the delayed intervention for [Sanford's] change in clinical status led

him to decompensating further and *expiring* from acute hypoxemic respiratory failure due to pneumonia." *Id.* at 8 (emphasis added).

Accordingly, Dr. Harris' report demonstrates that triable issues of fact exist and necessitate denial of summary judgment as to Plaintiff's medical malpractice claims. *See In re Joint E. & S. Dist. Asbestos Litg.*, 52 F.3d 1124, 1135 (2d Cir. 1995) ("Trial courts should not arrogate the jury's role in evaluating the evidence and credibility of expert witnesses by simply choosing sides in the battle of the experts.") (quotation omitted).

### E. Negligence

Defendants argue that Plaintiff's negligence claims should be "dismissed as duplicative of the medical malpractice claim[s]" to the extent that "defendants' conduct constitutes medical treatment or bears a substantial relationship to the rendition of medical treatment by a licensed physician." Dkt. No. 103-65 at 42.

Plaintiff responds that the following negligence claims are not duplicative of the medical malpractice claims and should survive: the claim against Gossman for failing to provide accurate vital signs to Dr. Dragomir and failing to follow Dr. Dragomir's instructions to send Sanford to the hospital; the claim against Lyga for "inexplicably wait[ing] 10-15 minutes before administering the Levaquin after Gossman gave it to her, and [abandoning] an ailing Sanford to serve dinner"; the claims against Gossman and Lyga for contravening ACNH policy by failing to know Sanford's code status, fill out an SBAR form, and to document Sanford's oxygen intake; the claims against all Defendants for failing to provide proper hygienic care to Sanford; and the claim against Slatky for failing to properly respond to Plaintiff's explicit complaints about Sanford's quality of care. Dkt. No. 114 at 38-39. The Court agrees with Defendants.

Under New York law, conduct is deemed medical malpractice, rather than negligence,

18

when it "constitutes medical treatment or bears a substantial relationship to the rendition of medical treatment by a licensed physician." *Newell v. Ellis Hosp.*, 117 A.D.3d 1139, 1140 (3d Dep't 2014) (quotation omitted) (collecting cases). The distinction between ordinary negligence and medical malpractice turns on whether the conduct complained of involves "a matter of medical science or art requiring special skills not ordinarily possessed by lay persons or whether the conduct complained of can instead be assessed on the basis of the common everyday experience of the trier of the facts." *Matter of Barresi v. State of New York*, 232 A.D.2d 962, 963 (3d Dep't 1996) (quotation omitted).

Here, Plaintiff's putative negligence claims all involve decisions regarding the proper medical treatment and level of care in a nursing home. Specifically, she alleges that Defendants breached a duty for failing to follow a physician's orders and providing inaccurate vital signs, failing to administer Levaquin, failing to know a code status and document oxygen intake, and failure to take proper hygienic care of Sanford and properly respond to complaints about Sanford's hygienic care. Because medical treatment decisions and providing care in a nursing home are beyond the "common everyday experience of the trier of the facts," Plaintiff's negligence claims are dismissed in favor of Plaintiff's medical malpractice claims. *See Rabinovich v. Maimonides Med. Ctr.*, 179 A.D.3d 88, 93 (2d Dep't 2019) ("[A]n action sounds in medical malpractice where the determination involves a consideration of professional skill and judgment.") (collecting cases).[15]

---

[15] Finally, the Court notes that discovery in this case closed on May 30, 2022, *see* Dkt. No. 80, and there is no indication in the record that Plaintiff served the unnamed Doe Defendants, John and Jane Does #1-5, as required by Rule 4 of the Federal Rules of Civil Procedure, Fed. R. Civ. P. 4(m); *cf*. Dkt. Nos. 5-8. Dismissal is warranted where a plaintiff "made no effort to effect service within the service period, neglected to ask for an extension within a reasonable period of time, and has advanced no cognizable excuse for the delay." *Zapata v. City of New York*, 502 F.3d 192, 199

## V. CONCLUSION

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Defendants' request for oral argument, Dkt. No. 103 at 1, is **DENIED**; and it is further

**ORDERED** that Defendants' motion for summary judgment, Dkt. No. 103, is **GRANTED IN PART** and **DENIED IN PART** as follows:

**GRANTED** as to Plaintiff's substantive due process claims against all Defendants;

**GRANTED** as to Plaintiff's negligence claims against all Defendants; and

**DENIED** in all other respects; and it is further

**ORDERED** that Plaintiff's letter motions, Dkt. Nos. 120, 132, are **DENIED as moot**; and it is further

**ORDERED** that John and Jane Does #1-5 are **DISMISSED**; and it is further

**ORDERED** that the following claims remain: (1) FNHRA claims against all Defendants pursuant to Section 1983; (2) NYPHL claims against all Defendants; and (3) medical malpractice claims against all Defendants; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties in accordance with the local rules.

**IT IS SO ORDERED.**

Date: March 29, 2024
Albany, New York

Anne M. Nardacci
U.S. District Judge

---

(2d Cir. 2007); *see also Tolchin v. Cnty. of Nassau*, 768 F. App'x 60, 61-62 (2d Cir. 2019) (affirming dismissal pursuant to Rule 4(m) where plaintiffs did not properly serve defendants until "more than 16 months after the complaint was filed"). The Amended Complaint was filed on July 2, 2019, Dkt. No. 12, and as such Plaintiff's time to complete service has expired. As such, Plaintiff's claims against the unnamed Doe Defendants are dismissed.